UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JONATHON M. MARK,

                Plaintiff,

v.                                              Case No. 22-cv-262-pp

OFFICER JOSEPH BELISLE,

                Defendants.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 35) AND DISMISSING CASE**

---

      Plaintiff Jonathon M. Mark, who previously was incarcerated at the Fond du Lac County Jail and is representing himself, filed this case alleging violations of his constitutional rights. The plaintiff is proceeding on a Fourth Amendment claim against defendant City of Fond du Lac Police Officer Joseph Belisle for an allegedly unlawful stop. Dkt. Nos. 30, 32. On July 18, 2024, the defendant filed a motion for summary judgment. Dkt. No. 35. The next day, the court ordered that the plaintiff's response was due on August 19, 2024, and that if the court did not receive by that date either the plaintiff's response or an explanation for why he could not timely file a response, it would resolve the defendant's motion without considering a response from the plaintiff. The court has not received the plaintiff's response.[1] This order grants the defendant's motion for summary judgment and dismisses this case.

---

[1] Recently, an order in another one of the plaintiff's cases was returned to the court as undeliverable. See Mark v. Zagorski, Case No. 24-cv-430-pp. In that case, court staff searched CCAP and found an address for the plaintiff that had

1

**I. Defendant's Motion for Summary Judgment (Dkt. No. 35)**

A. Facts

In February 2019, the City of Fond du Lac Police Department (FPD) required all police officers to attend daily briefing sessions to, among other things, discuss individuals who were wanted on outstanding arrest warrants. Dkt. No. 37 at ¶1. During briefing sessions, officers were presented with photographs of the wanted individuals and with physical information regarding the wanted individuals (including weight, height, hair color, and eye color). Id. at ¶¶2-3. Officers also were advised of whether the wanted individuals had a history of violence and/or resisting law enforcement. Id. at ¶4.

The defendant, FPD Officer Joseph Belisle, attended daily briefing sessions during his career, including in February 2019. Id. at ¶5. During those briefing sessions, the defendant was informed that the plaintiff was wanted on an outstanding arrest warrant. Id. at ¶6. The defendant was advised that the plaintiff is a taller/heavier set white male who has a history of violence and resisting law enforcement and was presented with a photograph of the plaintiff's face. Id. at ¶¶7-9.

Before his shift on February 23, 2019, the defendant attended a briefing session during which he was advised that the plaintiff was still wanted on an

---

been updated as of July 30, 2024—50 N. Portland St., Fond du Lac, WI 54935. In this case, there is no indication that the plaintiff did not receive the defendant's motion for summary judgment or the court's order directing him to respond to the motion. Although the plaintiff has not updated his address with the court in this case, as required, the court has updated his address based on the information on CCAP.

outstanding arrest warrant. Id. at ¶11. The defendant was provided with the plaintiff's physical description, was informed that the plaintiff has a history of violence and resisting law enforcement and was presented with a photograph of the plaintiff's face. Id. at ¶¶12-14. That same day, the defendant went to a Kwik Trip in Fond du Lac to interview two witnesses regarding an unrelated investigation. Id. at ¶15. At 10:29 p.m., while the defendant was standing outside near the entrance of the Kwik Trip, he observed "a male individual come from behind Kwik Trip around the corner on the west side of the building, walking past [him] with his hood up." Id. at ¶16. At that time, the defendant noticed that the individual was "a larger, heavier set, white male" and "got to view the side of his face." Id. at ¶17. Based on the individual's size, the side view of his face and the information provided during police briefings, the defendant strongly suspected the individual was the plaintiff, but he was not one hundred percent sure at that point. Id. at ¶18.

The plaintiff walked inside the Kwik Trip. Id. at ¶19. At that time, the defendant used his police radio to request backup officers because he strongly suspected the individual was the plaintiff and because he knew the plaintiff has a history of violence and resisting law enforcement. Id. at ¶20. In his initial radio transmission, the defendant inadvertently referred to the plaintiff as "Mark King;" however, the responding officers knew the defendant was referring to the plaintiff, Jonathon Mark:

> Originally when I called the information out to dispatch I misspoke I said the name Mark King. The officers that were responding knew who I was talking about as Officer Meudt got on the radio and advised dispatch to do an in-house check for a Jonathon Mark who

3

has probation warrant that is the name that I meant to say but I could not think of the first name when I originally saw JONATHON walk past me briefly into Kwik Trip.

Id. at ¶21.

The plaintiff then exited the Kwik Trip and walked past the defendant again, coming within inches of him. Id. at ¶22. The defendant "was able to get a frontal view" at that time and confirmed that the individual was, in fact, the plaintiff. Id. at ¶23. The defendant then asked the plaintiff for his name and identification. Id. at ¶24. The plaintiff turned around to face the defendant but refused to provide his name or identification, then started walking away from the defendant. Id. at ¶¶25-26. The defendant stopped the plaintiff from walking away and stated (among other things) the following: "you have a warrant for your arrest . . . you look like your name is Jonathon . . . ." Id. at ¶27. The plaintiff pulled his arm away and fled from the defendant on foot. Id. at ¶28. The defendant chased the plaintiff and escorted him to the ground shortly thereafter. Id. at ¶29. Additional officers arrived, handcuffed the plaintiff and placed him under arrest. Id. at ¶30.

During the criminal case, the plaintiff (through his legal counsel) "filed a motion seeking to suppress on the basis that [the defendant] lacked reasonable suspicion to stop him" on February 23, 2019. Id. at ¶31. The parties attended a suppression hearing where the plaintiff was represented by legal counsel. Id. at ¶32. The defendant testified during the hearing and gave testimony during his direct and/or cross-examination. Id. at ¶33. The defendant testified that: (1) he knew the plaintiff was wanted because he had seen the notice on the

4

Case 2:22-cv-00262-PP   Filed 09/10/24   Page 4 of 11   Document 44

SharePoint system and he knew the plaintiff "had an active probation warrant for his arrest"; (2) it was routine department practice to do daily briefing sessions to discuss individuals who were wanted on outstanding arrest warrants; (3) while he was at the Kwik Trip, he saw the plaintiff walk past him into the store, and he got a good enough look to believe this was the plaintiff and request backup; (4) he did an in-house check to confirm the individual's name; and (5) when the plaintiff exited the Kwik Trip, the defendant was able to get a frontal view of him and confirm it was the plaintiff. Id. The plaintiff, through his legal counsel, presented arguments during the suppression hearing. Id. at ¶34.

During the criminal case, the trial court denied the plaintiff's motion to suppress and determined that the defendant had reasonable suspicion and lawful authority to stop the plaintiff. Id. at ¶35. The trial court stated the following during the suppression hearing:

> The Court now having heard the arguments of counsel, with the testimony presented, the Court finds as fact that on [February 23, 2019], [the defendant] was on duty, has four years of experience just about with the City of Fond du Lac Police Department, academy trained, monthly trainings, was lawfully doing police business on Kwik Trip on South Main speaking to two individuals regarding a domestic violence case. And prior to this time [the defendant] was obviously attentive and listening at various briefings that officers get and was aware that the detective bureau had a want or a person wanted by the detective bureau for a police matter, and that there was also an active Department of Corrections probation warrant, and this was something detectives can log into that's called SharePoint.
>
> And the evidence shows that the briefings from the administration to their street officers, including the information on SharePoint, included information that the subject, [the plaintiff], has been known to be resistive and/or violent, and that was in the knowledge

5

of [the defendant], and, thus, while he was speaking to these two people in front of the Kwik Trip, he did observe the [plaintiff] come around the corner and walk directly past the officer. The officer got a good side profile, and as he has confirmed on the witness stand with credible testimony, that the look was good enough, as he ceased his duties with the domestic violence individuals and told them that he would get back to them.

[The defendant] obviously was convinced enough that he spotted the [plaintiff] that he did radio in that he had observed the person wanted on SharePoint and with the warrant from the DOC. And the officer explained, in part, he's trained to get backup when he involves with people that have known resistance or violence with officers, and the officer did testify today that he did know the [plaintiff]—or at least observed to six foot one, about 310 pounds plus

. . . the evidence is crystal clear that there was a photograph of the [plaintiff] that [the defendant] relied upon when he made the connection that I know that guy, there's a warrant on him, and he's wanted through SharePoint. And that's confirmed because when he called dispatch, that's actually what he shared as well, that the person, while he had the name wrong, he did make the connection through SharePoint.

And the other key fact is that the two domestic violence individuals were sent inside the store, and then [the plaintiff] came out, and the officer got a frontal full view of the [plaintiff] as he exited Kwik Trip, and this is a confirming visual that this is the same fellow that he was trained that he was wanted from SharePoint with an active DOC warrant. So there is, as a fact, way more than a hunch. This is a positive visual ID
. . . .

So with those facts, the motion is denied, as the Court concludes that this was not just a hunch. This was, in fact, good police work based on his attentiveness to training, keeping track of people in warrant status, and this was a particularized conclusion based on seeing the photo of the [plaintiff] and recognizing his face in close proximity on two separate occasions. So the motion is denied.

Id. at ¶36; Dkt. No. 39-2 at 25-28.

The plaintiff appealed the trial court's decision denying his motion to suppress, including the trial court's ruling that the defendant had reasonable

6

suspicion to stop him on February 23, 2019. Dkt. No. 37 at ¶37. The Wisconsin Court of Appeals held that the trial court's findings were not "clearly erroneous," affirmed the trial court's decision and agreed that the defendant had reasonable suspicion and lawful authority to stop the plaintiff based on the following:

> The officer had seen [the plaintiff's] picture in multiple briefings and was told to be on the lookout for [the plaintiff] because he had an outstanding warrant for a violent crime. The officer then saw [the plaintiff] walk into the Kwik Trip, and although he only saw him from the side view with his hood up, this view was '[g]ood enough' for the officer to think it was [the plaintiff]. The officer's identification of [the plaintiff] was confirmed when he saw [the plaintiff] exit the Kwik Trip, allowing a 'full frontal view' of [the plaintiff].
>
> . . . .
>
> What [the defendant] did here was unquestionably reasonable. He saw someone whom he believed to be someone with an outstanding arrest warrant and known to be violent. He did not act immediately but waited to confirm that [the plaintiff] was in fact that individual. This was *not* an unreasonable intrusion. In fact, it is the textbook example of good police work. The law does not compel an officer in these circumstances to simply 'shrug his shoulders' and let a criminal walk away.. . . Had [the defendant] been wrong about recognizing this individual as [the plaintiff], the interaction would have ended when the person clarified that he in fact was not [the plaintiff]. Of course, that was not what happened, and [the defendant's] reasonable actions resulted in arresting a person with an outstanding warrant who was known to be violent.

Id. at ¶¶38-39; Dkt. No. 39-1 at 8-9.

### B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v.

7

Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

    C.    Discussion

The defendant contends that the plaintiff's Fourth Amendment claim is barred by issue preclusion. Dkt. No. 36 at 7-10. He also argues that the court should dismiss the claim because he had reasonable suspicion to stop the plaintiff, id. at 10-13, and that he is entitled to qualified immunity, id. at 13-14.

A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984); see also, 28 U.S.C. §1738. "Issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." Dexia Credit Local v. Rogan, 629 F.3d 612, 628 (7th Cir. 2010); Bailey v. Andrews, 811 F.2d 366, 369 (7th Cir. 1987). A §1983 plaintiff can be collaterally estopped from relitigating Fourth Amendment claims that were lost at a criminal suppression hearing. See Allen v. McCurry, 449 U.S. 90, 103-05 (1980); Guenther v. Holmgreen, 738 F.2d 879, 883-84 (7th Cir. 1984); see also Munz v. Parr, 972 F.2d 971, 973 (8th Cir.

8

1992); Valley Wood Preserving, Inc. v. Paul, 785 F.2d 751, 753 (9th Cir. 1986). The preclusive effect in federal court of plaintiff's state-court judgment is determined by Wisconsin law. See Migra, 465 U.S. at 81.

In Wisconsin, the ruling on an issue raised and necessarily determined in a proceeding that ended in a valid judgment may be, but is not always, preclusive in later litigation. Rille *ex rel.* Rille v. Physicians Ins. Co., 300 Wis. 2d 1, 728 N.W.2d 693, 702 (Wis. 2007); City of Sheboygan v. Nytsch, 296 Wis. 2d 73, 722 N.W.2d 626, 630-31 (Wis. Ct. App. 2006). Not always, because Wisconsin courts apply issue preclusion as a matter of equitable discretion even when the legal elements are met. Rille, 728 N.W.2d at 702-03. Judges look at a variety of factors in evaluating whether it would be fundamentally unfair to apply issue preclusion: whether the party opposing issue preclusion could have obtained review of the earlier adverse decision, whether the earlier proceeding was of significantly lower quality or scope, whether the parties' burdens have shifted since the earlier proceeding and whether the party opposing preclusion lacked an adequate incentive or opportunity to litigate the issue fully in the earlier proceeding. Paige K.B. *ex rel.* Peterson v. Steven G. B., 226 Wis. 2d 210, 594 N.W.2d 370, 375 (Wis. 1999); Michelle T. *ex rel.* Sumpter v. Crozier, 173 Wis. 2d 681, 495 N.W.2d 327, 330-31 (Wis. 1993) (deriving factors from Restatement (Second) of Judgments §28 (1982)).

In this case, the plaintiff raises the same issue he presented to the criminal court: that the defendant lacked reasonable suspicion to stop him on February 23, 2019. The plaintiff litigated the issue in his state court criminal

9

Case 2:22-cv-00262-PP   Filed 09/10/24   Page 9 of 11   Document 44

case, and he appealed the trial court's ruling to the court of appeals. The trial court's ruling on the issue was essential to the final judgment in the plaintiff's criminal case because the obstructing/resisting charge would have been dismissed if the trial court (or the court of appeals) had determined that the defendant lacked reasonable suspicion to stop the plaintiff. The plaintiff's issue was fully litigated in state court, where he was represented by counsel. Applying the doctrine of issue preclusion will not result in any unfairness to the plaintiff.

Because the court has determined that issue preclusion bars the plaintiff's Fourth Amendment claim, it will not address the defendant's remaining arguments in support of his motion for summary judgment. The court will grant the defendant's motion and dismiss the case.

## II. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 35.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule

of App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 10th day of September, 2024.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**